UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WAUBAY LAKE FARMERS ASSOCIATION, IVAN ZOCHERT, NEIL ZOCHERT, TED WASILK, ALAN WILKA, MIKE KOSLOWSKI, JIM ZENK; and DENNIS ZENK, as representative of the class herein defined, | * * * * * * * | CIV 12-4179-RAL |
| Plaintiffs, | * * * | OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |
| vs. | * * | |
| BNSF RAILWAY COMPANY, | * * | |
| Defendant. | * | |

## I. INTRODUCTION

Waubay Lake Farmers Association, an unincorporated association comprised of farmers in Day County, South Dakota, and class representatives Ivan Zochert, Neil Zochert, Ted Wasilk, Alan Wilka, Mike Koslowski, Jim Zenk, and Dennis Zenk (collectively "Plaintiffs"), sued Defendant BNSF Railway Company (BNSF) asserting that an undersized culvert beneath the BNSF railroad bed has caused flooding of their properties. Doc.1; Doc. 28; Doc. 78. Plaintiffs filed a Motion for Class Certification, Doc. 58. BNSF has filed a Motion for Summary Judgment, Doc. 62. This Court grants BNSF's Motion for Summary Judgment for the reasons explained below and therefore denies Plaintiffs' Motion for Class Certification as moot.

## II. FACTS

With its Motion for Summary Judgment, BNSF filed a Statement of Undisputed Material Facts, Doc. 64, in compliance with Local Rule 56.1(A) of the Civil Local Rules of Practice for the United States District Court for the District of South Dakota. Local Rule 56.1 requires Plaintiffs to file a response to BNSF's Statement of Undisputed Material Facts by responding to

"each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record" and to "identify any material facts as to which it is contended that there exists a genuine material issue to be tried." D.S.D. Civ. LR 56.1(B). Instead of doing so, Plaintiffs stated that they "accept the Defendant's Statement of facts for the purpose of this motion." Doc. 69 at 1. Nevertheless, to ensure that the facts are viewed in the light most favorable to Plaintiffs as the non-moving party, this Court draws the facts not only from BNSF's Statement of Undisputed Material Facts, but also from Plaintiffs' Complaint and briefing where appropriate.

This lawsuit involves railroad tracks, a track bed, and culverts running through that track bed, all of which the parties believe to have been constructed over one hundred years ago. Doc. 64 at ¶¶ 1–2. In the early 1980s, the State of South Dakota purchased the tracks at issue from the failing Milwaukee Railroad and, around 2005, BNSF purchased the title to the right-of-way from the State of South Dakota. Doc. 64 at ¶ 2.

The tracks at issue run east and west through Day County near the town of Waubay, South Dakota. Doc. 64 at ¶ 3. A series of lakes in Day County and neighboring Roberts County collectively form the Waubay Lake Watershed (the Watershed). Doc. 64 at ¶ 3. The Watershed is a closed basin—that is, surface ground water collects in the lakes and does not have a natural outlet to a river, sea, or ocean. Doc. 64 at ¶ 4. Water in the Watershed tends to funnel southward through Rush Lake into and through Little Rush Lake and finally through a channel towards the basin's southern collection point at Bitter Lake. Doc. 64 at ¶ 5. BNSF's tracks cross the southern portion of Little Rush Lake near where Little Rush Lake channels water to Bitter Lake. Doc. 64 at ¶¶ 5–6. The particular stretch of tracks at issue runs for about a mile. Doc. 64 at ¶ 9. To accommodate water flowing from Little Rush Lake through the channel to Bitter Lake, BNSF's

trackbed in the mile at issue has five culverts. Doc. 64 at ¶¶ 8–9. Plaintiffs complain about the size of one culvert, number 647.80 ("Culvert 647.80"), which is a 42-inch diameter culvert with a total opening area of 9.6 square feet. Doc. 64 at ¶ 10; Doc. 65-5 at 2. Culvert 647.80 is completely submerged under water or beneath ice throughout the year.

Running just to the south of the tracks at issue is a township road maintained by Day County. Doc. 64 at ¶¶ 11, 39. This township road has two 24-inch diameter culverts with a total opening area of 6.3 square feet near Culvert 647.80, but it has no other drainage structures which correspond to or parallel BNSF's four other culverts. Doc. 64 at ¶ 11; Doc. 65-5 at 2. The culverts[1] beneath the township road have a combined capacity less than Culvert 647.80 and thus constitute the drainage structures that control the volume of water flow from Little Rush Lake into Bitter Lake. Doc. 64 at ¶ 39; Doc. 65-5 at 3.

Historically, water levels in the Watershed have fluctuated. Doc. 64 at ¶¶ 26–29. During some decades, the water levels within the Watershed were quite low. Doc. 64 at ¶¶ 26–29. Beginning twenty to twenty-five years ago, increased precipitation and a decreased evaporation rate caused water levels to increase in all lakes of the Watershed. Doc. 64 at ¶¶ 28, 40–41. For instance, the water level on Waubay Lake rose by over 20 inches between 1990 and 1999. Doc. 64 at ¶ 29. Because the Watershed has abundant low-lying land, the surface area covered by the higher water is dramatic. Doc. 64 at ¶ 29.

Plaintiffs first encountered flooding of parts of their property in the mid 1990s. Doc. 64 at ¶ 30. Five of the seven named Plaintiffs in this case were among plaintiffs to sue a landowner whose farm crossing had been a longstanding blockage of the channel between Little Rush Lake

---

[1] There is another township culvert further downstream from Culvert 647.80 that has a diameter of 36 inches and a total opening area of 7.1 square feet. Doc. 65-5 at 2.

and Bitter Lake. Doc. 64 at ¶¶ 31–35. That litigation culminated with a settlement under which the landowner removed the farm crossings, but did not pay damages. Doc. 64 at ¶ 37. Although the removal of those obstacles restored the direct channel between Little Rush Lake and Bitter Lake, the lake levels within the Watershed continued to climb. Doc. 64 at ¶¶ 38–39.

Plaintiffs assert claims of negligence, trespass, and nuisance against BNSF. Doc. 78 at ¶¶ 19–32. Plaintiffs' negligence claim contends that BNSF has two different duties, both of which allegedly require BNSF to reconstruct its culvert to accommodate the increased water now present in the Watershed. Doc. 78 at ¶¶ 19–20. Plaintiffs' negligence claim relies on 49 C.F.R. § 213.33,[2] South Dakota Codified Law (SDCL) section 49-16A-98,[3] and South Dakota common law. Doc. 78 at ¶ 19.

Plaintiffs allege that these statutes establish a duty to "maintain drainage and water carrying facilities under [a] roadbed to accommodate expected water flow for the area and to alter the facilities to match current conditions." Doc. 78 at ¶ 19. Plaintiffs rely on general state common law principles to allege that BNSF "has a duty to construct culverts in its roadbed of a sufficient capacity to carry off the surface waters flowing through the natural drainage channel

---

[2]Section 213.33 is a federal regulation enacted pursuant to the Federal Railway Safety Act (FRSA). M.D. Mall Assocs. v. CSX Transp. Inc., 715 F.3d 479, 485 (3rd Cir. 2013). That regulation provides that "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." 49 C.F.R. § 213.33 (2013).

[3]Section 49-16A-98 is entitled "Restoration and maintenance of watercourses and highways affected by railroad construction." It states:
> Each railroad shall restore every stream of water, watercourse, street, highway, toll road, turnpike, or canal, across, along, or upon which its road is constructed, to its former state or to such condition as that its usefulness is not materially impaired, and shall maintain the same in such condition against any effects produced by such railroad.

SDCL § 49-16A-98.

which the roadbed intersects." Doc. 78 at ¶ 20.

Plaintiffs complain that BNSF has breached these duties because it "has failed to maintain or upgrade its culvert to a sufficient capacity to safely convey the natural and expected water flow through the drainage channel." Doc.78 at ¶ 21. Plaintiffs allege that BNSF's failure to "maintain or upgrade its culverts" has caused water to back up onto Plaintiffs' properties thereby constituting a trespass and nuisance. Doc. 78 at ¶¶ 21, 27–32; Doc. 43 at 5. Plaintiffs admit that increased rain in northeastern South Dakota over the last few decades has caused lakes in the Watershed to swell. Doc. 59 at 1. Plaintiffs claim "that as [a] result of this temporary weather pattern[,] the culverts through the Defendant's roadbed have not been properly maintained and do not permit natural drainage." Doc. 59 at 1. Plaintiffs further assert that, because BNSF had "knowledge of changing weather patterns[, it] must amend drainage structures to permit natural drainage." Doc. 59 at 12.

Plaintiffs do not dispute BNSF's claims that the increased water levels are a recent phenomenon or that the township road limits the flow of water from Little Rush Lake to Bitter Lake. Doc. 64 at ¶¶ 39, 42. BNSF hired an expert to assess the cause of the flooding, Plaintiffs did not hire an expert, and Plaintiffs do not contest what BNSF's expert determined. The only evidence that BNSF's culverts are the cause of the flooding north of the culvert is that lake levels are higher in Waubay Lake, Rush Lake, and Little Rush Lake to the north of Culvert 647.80 than in Bitter Lake to the south. Doc. 64 at ¶ 43; Doc. 65-5.

The relief Plaintiffs seek is somewhat unclear and has been evolving. Plaintiffs' Second Amended Complaint seeks $10 million in damages "incident to the relief requested" for their tort claims. Doc. 78 at ¶ 32. Plaintiffs do not specify what relief the damages are "incident to," but Plaintiffs seek "such other relief the court may deem appropriate." Doc. 78 at ¶ 32. Although

Plaintiffs' Second Amended Complaint does not explicitly request injunctive relief, Plaintiffs' briefing makes clear that they seek, or will seek, "equitable relief," "removal of all blockage of the natural drainage by [BNSF]," and "specific relief requiring [BNSF] to construct its roadbed to conform to and allow for natural drainage." Doc. 59 at 2–3.

The named Plaintiffs wish to represent a class of residents and landowners in Day County within the Watershed, consisting of certain owners of farmland north of BNSF's trackbed. Doc. 64 at ¶ 12. Plaintiffs are unsure of the class's size, but presently believe it to number more than one hundred. Doc. 78 at 2. The named Plaintiffs' and putative class members' farms are located throughout Day County at varying distances from the culvert and roadbed. Doc. 64 at ¶¶ 15, 16. Some class members own land just north of BNSF's tracks near Little Rush Lake, while others own land north of the Waubay Lakes chain altogether. Doc. 64 at ¶ 16.

## III. DISCUSSION

### A. BNSF's Motion for Summary Judgment

#### 1. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012) (quoting Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011)). A

party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).

### 2. Preemption Defense

BNSF contends that Plaintiffs' state common law and state statutory claims are preempted by the Interstate Commerce Commission Termination Act of 1995 (ICCTA), Pub. L. No. 104-88, 109 Stat. 803 (1995) (codified as amended in scattered sections of 49 U.S.C.), and that SDCL section 49-16A-98 also is preempted by regulations issued pursuant to the Federal Railway Safety Act (FRSA), Pub. L. No. 103-272, 108 Stat. 745 (1994) (codified as amended in scattered sections of 49 U.S.C.). Doc. 63 at 8–9. The Supremacy Clause, U.S. Constitution article VI, vests with Congress the power to preempt, and thus displace, state laws which frustrate or interfere with federal law. Gunter v. Farmers Ins. Co., Inc., 736 F.3d 768, 771 (8th Cir. 2013). Preemption can occur in three ways: (1) a federal law may expressly preempt a state law by prohibiting state regulation in a particular area; (2) a federal law may impliedly preempt a state law by occupying the field of regulation; or (3) a federal law may conflict with a state law leading to the state law's preemption. Kurns v. R.R. Friction Prods. Corp., 132 S. Ct. 1261, 1265–66 (2012). "The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 369 (1986). When a statute is said to expressly preempt a state law, the court must look to the statute's text to "identify the domain expressly pre-empted by [the statute's] language." Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996) (internal quotation marks omitted).

ICCTA and FRSA are two components of a multi-part federal-state regulatory partnership addressing railroad industry issues. See Iowa, Chi. & E. R.R. Corp. v. Wash. Cnty., 384 F.3d

7

557, 558–60 (8th Cir. 2004). Both ICCTA and FRSA preempt state statutes and regulations in some circumstances. Id.; see also 49 U.S.C. §§ 10501(b), 20106(a). The two statutes are complimentary and the two federal agencies empowered to implement the statutes exercise complimentary powers. Tyrrell v. Norfolk S. Ry., 248 F.3d 517, 523 (6th Cir. 2001). When the state statute addresses rail safety, then courts analyze preemption under FRSA. Id.; see also Island Park, LLC v. CSX Transp., 559 F.3d 96, 107 (2nd Cir. 2009) ("Several circuits that have examined the interplay between ICCTA and FRSA have concluded that the federal statutory scheme places principal federal regulatory authority for rail safety with the Federal Railroad Administration . . . , not the STB."). When the state statute addresses construction or economic concerns, then courts analyze preemption under ICCTA.[4] Tyrrell, 248 F.3d at 523.

Plaintiffs contend that SDCL section 49-16A-98 imposes a duty on BNSF to install a larger culvert beneath the roadbed. Doc. 43 at 4. Because Plaintiffs invoke SDCL section 49-16A-98 as a construction statute and not a safety statute, preemption under ICCTA and not FRSA becomes the issue.

### 3. ICCTA Preemption of Plaintiffs' State Law Claims

Congress had long exercised broad regulatory authority over the railroad industry. Iowa, Chi. & E. R.R. Corp., 384 F.3d at 558. However, in 1995, Congress, convinced that some deregulation of the railroad industry was needed, enacted ICCTA. Id. at 558–59.

> ICCTA repealed much of the economic regulation previously conducted by the [Interstate Commerce Commission (ICC)] and by state railroad regulators working in conjunction with the ICC. In so doing, Congress recognized that continuing state

---

[4] ICCTA does not displace regulations issued under FRSA. Tyrrell, 248 F. 3d at 520–21; see also Iowa, Chi. & E. R.R. Corp., 384 F.3d at 558 (refusing to find state statutes are impliedly preempted by ICCTA as doing so would require displacement of other federal statutes as well).

8

> regulation—of intrastate rail rates, for example—would risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation.

Id. at 559; see also Elam v. Kan. City S. Ry. Co., 635 F.3d 796, 805 (5th Cir. 2011) ("Congress was particularly concerned about state *economic* regulation of railroads when it enacted the ICCTA.").

The ICCTA grants "exclusive" jurisdiction to the Surface Transportation Board (STB) over "transportation by rail carrier," and "the construction, [and] operation of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State." 49 U.S.C. § 10501(b). Such activities were described by the Fifth Circuit as "the fundamental aspects of railroad regulation." Franks Inv. Co. v. Union Pac. R.R. Co., 593 F.3d 404, 410 (5th Cir. 2010) (interpreting 49 U.S.C. § 10501 (b)). Section 10501(b) also contains an express preemption clause, stating: "[T]he remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State Law." 49 U.S.C. § 10501(b); see also Franks Inv. Co., 593 F.3d at 410 (holding § 10501(b) preempts state and federal remedies "that have the effect of regulating rail transportation"(emphasis omitted)). The ICCTA defines "transportation" broadly to include not only a "locomotive, car, [or] vehicle," but a "property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail." 49 U.S.C. § 10102(9). Courts interpreting the interplay between the ICCTA's preemption clause and state statutes have held that the ICCTA preempts state laws "that have the effect of *managing or governing* rail transportation" or laws whose remedies would "have the effect of regulating [i.e. managing or governing] rail transportation[.]" Elam, 635 F.3d at 805 (quoting Franks, 593 F.3d at 410); Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 158 (4th Cir. 2010) (holding the

9

ICCTA preempts any "state or local law that permits a non-federal entity to restrict . . . the operations of a rail carrier"); Island Park, LLC v. CSX Transp., 559 F.3d 96, 102 (2nd Cir. 2009) ("ICCTA preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." (internal quotation marks and citation omitted)). A state law tort claim seeking damages[5] and injunctive relief constitutes a "regulation." Kurns, 132 S. Ct. at 1269; see also Rushing v. Kan. City S. Ry. Co., 194 F. Supp. 2d 493, 499 (S.D. Miss. 2001). Therefore, a state law, even one that does not seem regulatory on its face, may be preempted by the ICCTA.

As the agency authorized by Congress to administer the ICCTA, the STB is "uniquely qualified" to determine whether ICCTA preemption has occurred. Emerson v. Kan. City S. Ry. Co., 503 F.3d 1126, 1130 (10th Cir. 2007) (quoting Green Mountain R.R. Co. v. Vermont, 404 F.3d 638, 642 (2nd Cir. 2005)). The STB has discussed the scope of ICCTA's preemption clause as follows:

> [C]ourts have found two broad categories of state and local actions to be preempted regardless of the context or rationale for the action. The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized.
>
> Second, there can be no state or local regulation of matters directly regulated by the Board--such as the construction,

---

[5] Even if Plaintiffs' Complaint could be construed as seeking damages only, such a suit would still be a form of regulation. Kurns, 132 S. Ct. at 1269 ("The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." (quoting San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247 (1959))); see also Rushing, 194 F. Supp. 2d at 499 (holding state common law tort suits can be a form of regulation if they are used to regulate the manner by which a railroad operates its switch yard).

> operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service.

CSX Transp., Inc.--Petition for Declaratory Order, 2005 WL 1024490, at *2 (Surface Trans. Bd. May 3, 2005) (internal citations omitted); see also Franks, 593 F.3d at 410–11 (noting the court's interpretation of the ICCTA preemption clause is consistent with the STB interpretation of the clause); Emerson, 503 F.3d at 1130 (same).

Plaintiff's tort claims allege that BNSF has a duty "to maintain . . . and *to alter* the *facilities* to match current conditions" and "to *construct* culverts in its roadbed of a sufficient capacity to carry off the surface waters." Doc. 78 at ¶¶ 19–20 (emphasis added). BNSF allegedly breached that duty by failing to reconstruct its facilities, culverts, and roadbed. Plaintiffs seek damages, an injunction, and an order requiring BNSF to replace Culvert 647.80 with a culvert with a higher capacity. This logically would require BNSF to halt use of its tracks to remove the existing culvert beneath the track and indeed beneath the current level of water, which likely would mean some demolition and rebuilding of its railway and roadbed. By requesting such relief, Plaintiffs seek to "manage or govern" how BNSF constructs its roadbed and operates its tracks by requiring replacement of a submerged culvert beneath the roadbed. Franks, 593 F.3d at 411. Thus, to the extent that Plaintiffs' claims are based on state law, such claims fall squarely within the express terms of the ICCTA's preemption clause. Plaintiffs may not use state common law and a state statute to regulate, and indeed seek to compel, BNSF's reconstruction of its culvert, roadbed, and tracks. Guckenberg v. Wis. Cent. Ltd., 178 F. Supp. 2d 954, 958 (E.D. Wis. 2001).

Many courts have held that similar state law claims concerning railroad regulation or seeking remedies that affect rail transport are preempted by the ICCTA. See, e.g., Griffioen v.

11

Cedar Rapids & Iowa City Ry. Co., 977 F. Supp. 2d 903, 905 (N.D. Iowa 2013) ("The cases are many and clear that the ICCTA preempts the field of interstate railroad regulation and grants complete and exclusive jurisdiction over disputes [concerning railroad regulation] to the STB."). Claims challenging a railroad facility's design or construction fall within the ICCTA's express preemption provision. See, e.g., Pere Marquette Hotel Partners, LLC v. United States, No. 09-5921, 2010 WL 925297, at *4–6 (E.D. La. Mar. 10, 2010) (holding the ICCTA preempts state negligence claims alleging negligent design and construction of railroad crossing, tracks, and roadbed); In re Katrina Canal Breaches Consol. Litig., No. 05-4182, 2009 WL 224072 (E.D. La. Jan. 26, 2009) (holding that a claim challenging a railway crossing's design and construction after a flood was preempted by the ICCTA). State-based tort claims that do not allege negligent construction or design also are preempted if they are directed at railroad operations. See, e.g., Elam, 635 F.3d at 807 (holding that a state anti-blocking statute, and the claims that arise from it, are completely preempted by the ICCTA because the statute and claims attempt to manage railroad operations and reach into the realm of economic regulation); Griffioen, 977 F. Supp. 2d at 906 (holding that the ICCTA preempts state tort claims that railroad negligently left full cars on its bridges in anticipation of upcoming flooding, which caused the bridges to collapse and exacerbated the effects of the flood); Maynard v. CSX Transp., Inc., 360 F. Supp. 2d 836, 843 (E.D. Ky. 2004) (holding that the ICCTA preempted negligence claim that track caused drainage to flood property); Guckenberg, 178 F. Supp. 2d at 958 (holding the ICCTA preempts state nuisance claim based on sounds from switching yard); Rushing, 194 F. Supp. 2d at 498–500 (holding the ICCTA preempts state tort law claims that were seeking to enjoin railroad from operating its switch yard in a loud manner, but not tort claims that do not relate to the railroad's operations).

12

The cases cited by Plaintiffs in their argument against the ICCTA preemption—Franks, 593 F.3d at 410–11 and Emerson, 503 F.3d at 1129—are distinguishable because they did not have the effect or intent of regulating rail transportation, nor did the claims impact the railroad's operations or management. Therefore, the claims in those cases did not fall within the scope of the ICCTA's preemption clause. In Franks, the plaintiff alleged that he had a "servitude of passage, similar to an easement," over a railroad's crossing. 593 F.3d at 411. The United States Court of Appeals for the Fifth Circuit held that the ICCTA did not preempt the plaintiff's claims because the state property law invoked did not "have the effect of managing or governing" rail transportation, but only "incidentally affected" rail transportation. Id. The Fifth Circuit contrasted the situation in Franks with Friberg v. Kansas City Southern Railway Co., 267 F.3d 439, 443 (5th Cir. 2001), where a state-based tort suit alleging that the railroad negligently allowed trains to block railroad crossings was preempted by the ICCTA because the suit "reach[ed] into the area of economic regulation of railroads" by attempting to dictate the way a railroad operates its trains. Id. at 440–41, 443. Plaintiffs' claim seeking to require BNSF to replace a water-submerged culvert within its roadbed is more akin to Friberg than to a simple right to cross over the railway as was the claim in Franks.

The decision of the United States Court of Appeals for the Tenth Circuit in Emerson similarly is distinguishable. In Emerson, a state tort suit alleged that a railroad negligently discarded old railroad ties and debris into a drainage causing water to back up and flood. Emerson, 503 F.3d at 1129–30. The ICCTA did not preempt the claims in Emerson because the plaintiff did not seek remedies regarding rail "transportation." Id. at 1130. Disposing of refuse into a ditch adjacent to a roadbed did not concern the movement of passengers or property by rail nor did the state remedies sought "affect the economic aspects of the Railroad's operations

13

subject to STB control." Id. at 1130, 1132. BNSF, however, did not create drainage issues by discarding items into the culvert or elsewhere. Rather, Plaintiffs seek to have BNSF change its actual roadbed to install a larger culvert to deal with rising surface water levels. Here, the state-law duties that Plaintiffs allege and the remedies sought for alleged breach of those duties fall within the scope of the ICCTA's express preemption clause because they seek to manage or govern the operation of railroad transportation.

Requiring Plaintiffs' claims to be raised before the STB, not this Court, is consistent with Congress's broad grant of jurisdiction to the STB. See City of Lincoln v. Surface Transp. Bd., 414 F.3d 858, 861 (8th Cir. 2005); Cedarapids, Inc. v. Chi., Cent. & Pac. R.R. Co., 265 F. Supp. 2d 1005, 1012 (N.D. Iowa 2003). By alleging that BNSF tortiously failed to reconstruct a trackbed and enlarge an existing culvert, Plaintiffs' suit affects "transportation by [a] rail carrier" and concerns the "construction" of railroad "tracks[] or facilities." 49 U.S.C. § 10501(b). Both of these categories of claims are preempted by the ICCTA and must be brought before the STB. See Pere Marquette Hotel Partners, 2010 WL 925297, at *5; In re Katrina Canal Breaches Consol. Litig., 2009 WL 224072, at *6; Maynard, 360 F. Supp. 2d at 843. This Court's conclusion that the ICCTA preempts all of Plaintiffs' state law claims, including any claim arising under SDCL section 49-16A-98, renders moot BNSF's argument that the FRSA preempts section 49-16A-98. See Norfolk S. Ry. Co., 608 F.3d at 157.

### 4. 49 C.F.R. § 213.33

Because the ICCTA preempts Plaintiffs' state law claims, the sole claim remaining in the Second Amended Complaint is BNSF's alleged breach of 49 C.F.R. § 213.33 by not rebuilding its culvert. Doc. 78 at ¶ 19. BNSF argues it has met any duty it may owe under § 213.33. Doc. 63 at 28. Plaintiffs did not directly respond to BNSF's argument that it has met its duty under

§ 213.33, but argued that § 213.33 imposes the same duty that Plaintiffs allege BNSF would have under Plaintiffs' state law claims.

Unlike the ICCTA, which concerns regulation over the economic and operational aspects of railroads, the FRSA, under which § 213.33 was promulgated, was enacted "to promote *safety* in every area of railroad operations and reduce railroad-related accidents and incidents." Cowden v. BNSF Ry. Co., 690 F.3d 884, 890 (8th Cir. 2012) (emphasis added) (quoting 49 U.S.C. § 20101). The FRSA provides the Secretary of Transportation broad powers to "prescribe regulations . . . for all areas of railroad safety." Id. (quoting 49 U.S.C. § 20103(a)). The Secretary has delegated authority to prescribe safety regulations to the Federal Railroad Administration (FRA). See CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 662–63 (1993). The FRA safety regulations are entitled the Track Safety Standards and are found at 49 C.F.R. § 213. The FRSA permits a plaintiff to bring tort claims "seeking damages for personal injury, death, or property damage" when the plaintiff alleges that "a party . . . has failed to comply with the [FRA regulation]." 49 U.S.C. § 20106(b)(1)(A).[6]

The Track Safety Standards establish the "minimum safety requirements for railroad

---

[6]The FRSA states that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a). To achieve this desired uniformity of railroad safety requirements, the FRSA, like the ICCTA, contains an express preemption clause that permits a state to adopt or maintain a law or regulation related to railroad safety "until the Secretary . . . prescribes a regulation . . . covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). A federal regulation will "cover" the same subject matter of the state requirement if the federal regulation "substantially subsume[s]" the subject matter addressed by the state regulation. Easterwood, 507 U.S. at 664. In 2007, Congress passed a "Clarification Amendment" to FRSA making clear that tort claims "seeking damages for personal injury, death, or property damage" can be brought when the plaintiff alleges that "a party . . . has failed to comply with the [FRA regulation]." MD Mall Assoc., LLC v. CSX Transp., Inc., 715 F.3d 479, 487–88 (3rd Cir. 2013) (quoting 49 U.S.C. § 20106(b)(A)). BNSF acknowledges that Plaintiff may sue to enforce a duty provided by a FRSA regulation codified at 49 U.S.C. § 213.33, even if they may not sue under state law. Doc. 63 at 28.

track." 49 C.F.R. § 213.1. Section 213.33 is entitled "Drainage" and provides that "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." 49 C.F.R. § 213.33. The FRA publishes a manual entitled "Track and Rail and Infrastructure Integrity Compliance Manual" (the Manual), which provides commentary and guidance on the Track Safety Standards for FRA inspectors.[7] The Manual provides the following guidance regarding § 213.33:

> Drainage facilities (bridges, trestles, or culverts) should be given careful detailed consideration during inspections. . . .
>
> The rule specifies that each drainage structure shall be maintained and the inspector should note conditions that would affect the integrity of the structure . . . .
>
> Drainage openings must also be inspected and notice given where debris has accumulated to such an extent that expected water flow cannot be accommodated.
>
> Most railroad drainage structures have existed for many years and, if properly maintained and kept free of debris, they are considered adequately designed to accommodate expected water flow, even though recent high-water marks may be slightly above the inlet opening.

2 Fed. Ry. Admin., supra, at 24. One court has observed that § 213.33 requires only that water

---

[7]BNSF cites to the Manual to elucidate the duties BNSF has under § 213.33 and for evidence that it has complied with those duties. Doc. 63 at 25–30. The Manual "provides technical guidance to Federal and State Track Inspectors . . . for enforcement of 49 CFR Part 213 Track Safety Standards." 1 Fed. Ry. Admin., Track and Rail and Infrastructure Integrity Compliance Manual 3 (January 2014), available at http://www.fra.dot.gov/eLib/details/L04401. Other courts have consulted the manual in claims relating to § 213.33. See, e.g., Anderson v. Wis. Cent. Transp. Co., 327 F. Supp. 2d 969, 976 (E.D. Wis. 2004).

"must be allowed to flow under a bridge without obstruction." Miller v. Se. Pa. Transp. Auth., 65 A.3d 1006, 1013 (Pa. Commw. Ct. 2013).

Plaintiffs argue that the requirement in § 213.33 that the "roadbed shall be maintained[8] and kept free of obstruction" requires BNSF to rebuild its culvert "to match the current conditions" of historically high water levels in the Watershed. Doc. 78 at 19. BNSF argues that it is not disputed that the Watershed's lake levels are at historic elevations, that the perhaps one-hundred-year-old culverts have accommodated the flow of water during many prior decades, and that § 213.33 requires the culverts to accommodate only "expected" water flows and not the unexpectedly high level of water currently in the Watershed. Doc. 63 at 29–30. BNSF also contends that even if it is required to accommodate the unusually high water volume in the Watershed, there is no material dispute of fact that restrictions imposed by the culverts beneath the township road ultimately control the drainage. Doc. 63 at ¶¶ 31–32.

Plaintiffs have not established a disputed material fact that BNSF has breached its duty under § 213.33. Plaintiffs, by accepting as true BNSF's Statement of Undisputed Material Facts, have admitted for the purposes of this case that the township road's culverts, not BNSF's culvert, are the structures controlling drainage from Little Rush Lake to Bitter Lake. BNSF's expert report found that the township road controls water flow into Bitter Lake, that BNSF's culvert has never been the controlling structure since measurements began, and that the BNSF culvert is a "hydraulic equalizer" leveling the lake on either side of the culvert with a height difference of only inches on either side of the culvert. Doc. 65-5 at 7. The expert report also found that the

---

[8]"Maintain" means "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." Black's Law Dictionary 1039 (9th ed. 2009).

Waubay Lake chain flows south into Bitter Lake and that, since at least 1998, the chain of lakes in the Watershed that includes Rush Lake and Little Rush Lake has been at a higher elevation than Bitter Lake. Doc. 65-5 at 3, 21. Plaintiffs allege that Culvert 647.80 cannot accommodate the standing water, but have admitted that the limiting structure is the township road's culverts and not BNSF's culvert. The only evidence that BNSF's culvert does not accommodate water is that the water levels in the lakes to the north of Culvert 647.80 are higher than the level in Bitter Lake. Doc. 64 at ¶ 43. This evidence does not mean that BNSF's culvert is the cause of that higher water, and BNSF's expert report (which Plaintiffs do not refute) establishes that township road culverts nearby are the controlling structures for what water flows from Little Rush Lake to Bitter Lake. Doc. 65-5 at 2–3. Thus, even if this Court were to conclude that BNSF's duty to maintain the culvert amounts to a duty to rebuild it, and that a duty to accommodate the expected flow of water amounts to a duty to accommodate the historically high water level, Plaintiffs have not established a material dispute of fact that BNSF's culvert is not accommodating water as required by § 213.33 or that the alleged failure of Culvert 647.80 to accommodate water is the cause of damage to the plaintiffs. Cf. Hendrix v. Schulte, 736 N.W.2d 845, 847 (S.D. 2007) ("In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury.").

### B.  BNSF's Other Claims and Plaintiffs' Motion for Class Certification

BNSF's argument that the statute of limitations has run on Plaintiffs' claims are moot because this Court grants summary judgment on other grounds. Similarly, Plaintiffs' Motion for Class Certification is moot because summary judgment is warranted.

## IV. CONCLUSION

For the reasons explained in this Opinion and Order, it is hereby

ORDERED that Defendant BNSF's Motion for Summary Judgment, Doc. 62, is granted.

It is further

ORDERED that Plaintiffs' Motion for Class Certification, Doc. 58, is denied as moot.

Dated August 28th, 2014.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE